UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOHN DOE, et al., | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 3:05-cv-1256 (JCH) |
| ALBERTO GONZALES, in his official | : | |
| capacity as Attorney General of the | : | |
| United States, et al., | : | |
| Defendants. | : | SEPTEMBER 9, 2005 |

**RULING ON PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION [Dkt. No. 33][1]**

## I.   INTRODUCTION

On August 9, 2005, the plaintiffs filed suit challenging the constitutionality of 18 U.S.C. § 2709.  One of the plaintiffs is John Doe, the recipient of a National Security Letter ("NSL") issued pursuant to § 2709.  That section requires any "wire or electronic communication service provider" to comply with requests by the Federal Bureau of Investigation ("FBI") for information.  18 U.S.C. § 2709(a)(2001).  Specifically, the statute permits the FBI to "request the name, address, and length of service of a person or entity if the Director (or his designee) certifies in writing to the wire or electronic communication service provider to which the request is made that the information sought is relevant to an authorized investigation to protect against international terrorism or clandestine intelligence activities."  Id. at § 2709(b)(2).

---

[1] This case was originally filed under seal.  While the case itself is no longer under seal, many of pleadings are sealed.  The parties have agreed to file redacted pleadings on the public docket.  In this Ruling, where court documents are referenced, the court cites the unsealed, redacted pleadings.

In this lawsuit, the plaintiffs claim, first, that § 2709 violates the First Amendment by prohibiting any person from disclosing that the FBI has sought or obtained information with a NSL; second, that § 2709 violates the First Amendment by authorizing the FBI to order disclosure of constitutionally protected information without tailoring its demand to a demonstrably compelling need; third, that § 2709 violates the First and Fourth Amendments because it fails to provide for or specify a mechanism by which a recipient can challenge the NSL's validity; fourth, that § 2709 violates the First, Fourth, and Fifth Amendments by authorizing the FBI to demand disclosure of constitutionally protected information without prior notice to individuals whose information is disclosed and without requiring that the FBI justify that denial of notice on a case-by-case basis; and fifth, that § 2709 violates the Fifth Amendment because it is unconstitutionally vague.  With respect to all five challenges, the plaintiffs claim that the statute is unconstitutional both on its face and as applied to them.  They seek declaratory and injunctive relief.

Currently pending before the court is plaintiffs' motion for preliminary relief filed on August 16, 2005.  The NSL in question tracks the language of the statute in advising the recipient "that Title 18, U.S.C., Section 2709(c), prohibits any officer, employee or agent of yours from disclosing to any person that the FBI has sought or obtained access to information or records under these provisions [18 U.S.C. § 2709]."  Redacted Exh. A to Redacted Compl.  The issue before the court in connection with the motion for preliminary injunction is whether the § 2709(c) prohibition on the plaintiffs' disclosure of the identity of the recipient is unconstitutional as applied in this case such that enforcement of that prohibition ought to be enjoined pending resolution of the case on

2

the merits.

At a telephone status conference on August 18, 2005, the parties agreed that the relevant facts are not in dispute.  See Charette v. Town of Oyster Bay, 159 F.3d 749, 755 (2d Cir. 1998) ("An evidentiary hearing is not required when the relevant facts either are not in dispute or have been clearly demonstrated at prior stages of the case . . ..").  The court imposed an expedited briefing schedule.  The defendants filed their brief in opposition, with a supporting affidavit, on August 29, 2005.  Plaintiffs replied on August 30, 2005.  The court heard oral argument on August 31, 2005.  At the court's request, and only after the court reviewed the parties' post-argument briefs and relevant case law on the propriety of ex parte review of classified materials, the defendants made available to the court for review certain classified information on September 5, 2005.  The court has now reviewed this material.  See Section III, infra.

## II.   BACKGROUND

A Federal Bureau of Investigation (FBI) agent telephoned the plaintiff, John Doe ("Doe"), a member of the American Library Association.  Doe possesses information about library patrons.  The agent informed an individual at Doe that the FBI would be serving a NSL on Doe and asked who at Doe could accept service.  Two agents delivered the NSL to Doe.  The NSL is on FBI letterhead and signed by defendant John Roe ("Roe").

The NSL directs Doe "to provide to the [FBI] any and all subscriber information, billing information and access logs of any person or entity related to [ ]."  Redacted Exh. A to Redacted Compl.  As required by § 2709, the NSL "certif[ies] that the information sought is relevant to an authorized investigation to protect against international

3

terrorism or clandestine intelligence activities, and that such an investigation of a United States person is not conducted solely on the basis of activities protected by the first amendment to the Constitution of the United States." Id. The NSL also includes a non-disclosure provision.  Specifically the letter correctly advises the recipient that, "Title 18, U.S.C., Section 2709(c), prohibits any officer, employee or agent of yours from disclosing to any person that the FBI has sought or obtained access to information or records under these provisions." Id.

To date, Doe has not supplied the information demanded by the NSL, and the FBI has not sought to compel compliance.  Following its receipt of the NSL, Doe sought legal counsel and retained the American Civil Liberties Union Foundation ("ACLU Foundation"), which represents Doe in this action and is also a plaintiff.  The ACLU Foundation is a 501(c)(3) organization that provides free legal representation to individuals and organizations in civil liberties cases.  The third plaintiff is the American Civil Liberties Union ("ACLU"), a 501(c)(4) organization that lobbies and provides public education regarding civil liberties issues.

Arguing that § 2709(c)'s ban on speech prohibits them from engaging in constitutionally protected speech that is relevant and perhaps crucial to an ongoing and time-sensitive national policy debate, the plaintiffs moved for preliminary relief to enjoin enforcement of § 2709(c) as to Doe's identity.

## III.    EX PARTE REVIEW OF CLASSIFIED MATERIALS

When pressed about their basis for the asserted compelling state interest for § 2709(c)'s gag provision, defendants offered at oral argument to make certain classified material available to the court, for ex parte review.  The defendants contend

4

that classified information, appropriately reviewed ex parte, ought to inform the court's resolution of the instant motion.  The plaintiffs argue that ex parte consideration of materials, on which the court's ruling on the merits is likely to turn, violates their due process rights.  See Abourezk v. Reagan, 785 F.2d 1043, 1060-61 (D.C. Cir. 1986) ("The openness of judicial proceedings serves to preserve both the appearance and the reality of fairness in the adjudications of United States courts.  It is therefore the firmly held main rule that a court may not dispose of the merits of a case on the basis of ex parte, in camera submissions.") (internal quotation marks and citation omitted).  For good reason, our system of justice relies on the adversarial process to bring to the attention of the finder of fact the strengths and deficiencies in parties' litigation postures.  "[F]airness can rarely be obtained by secret, one-sided determination of facts decisive of rights."  Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 170 (1951) (Frankfurter, J., concurring).

Nevertheless, given that the government's case rests on its ability to demonstrate a compelling state interest in preventing disclosure of information related to a counter-terrorism investigation, the court finds that it is appropriate to consider the ex parte documents for the limited purpose of determining whether to grant the preliminary injunction in a timely manner.  See Jifry v. Fed. Aviation Admin., 370 F.3d 1174, 1182 (D.C. Cir. 2004) ("[T]he court has inherent authority to review classified materials ex parte, in camera as part of its judicial review function.").  While it is "[o]nly in the most extraordinary circumstances [that] precedent countenance[s] court reliance upon ex parte evidence to decide the merits of a dispute," id. at 1061, the instant situation, where the executive branch determines that certain information ought to

5

remain classified in the interests of national security, but is necessary to its defense of this action,  constitutes such an extraordinary circumstance.  People's Mojahedin Org. of Iran v. Dep't of State, 327 F.3d 1238, 1242 (D.C. Cir. 2003) ("[U]nder the separation of powers created by the United States Constitution, the Executive Branch has control and responsibility over access to classified information and has compelling interest in withholding national security information from unauthorized persons in the course of executive business") (internal quotation marks and citation omitted).  To find otherwise, under these particular circumstances, might deprive the defendants of their ability to oppose the instant motion.

The court remains concerned, however, about the plaintiffs' ability to participate fully in this case.  Currently, neither plaintiffs nor their attorneys possess the requisite security clearance to view the classified evidence that defendants have provided this court in support of their opposition to the plaintiff's motion.[2]  However, it would be appropriate, if possible, to seek to obtain clearance for plaintiffs' lead counsel in connection with subsequent proceedings so that she can review the ex parte classified evidence.  Defendants would thus retain the ability to vigorously defend their case without compromising the secrecy of classified materials.  For these reasons, the court directs that defendants attempt, to the extent permitted by law, to provide plaintiffs with the opportunity for their lead attorney to seek to obtain the security clearance required to review and respond to the classified materials in connection with the resolution of this

---

[2]  The government has stated that the clearance process may take between two and four weeks.  Under the circumstances, therefore, any attempt to allow plaintiffs' counsel to view those documents and respond to them came into conflict with the time sensitivity of the pending motion.

6

case.

## IV.   PRELIMINARY INJUNCTION STANDARD

The nature of the preliminary injunction sought in this case triggers a higher standard than is normally applicable.[3]  A heightened standard is justified where "the issuance of an injunction will render a trial on the merits . . . partly meaningless, either because of temporal concerns . . . or because of the nature of the litigation, say, a case involving the disclosure of confidential information."  Tom Doherty Associates, Inc. v. Saban Entertainment, Inc., 60 F.3d 27, 35 (2d Cir. 1995) (citing Abdul Wali v. Coughlin, 754 F.2d 1015, 1026 (2d Cir. 1985), overruled on other grounds, O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 n.2 (1987)).  In this case, the parties agree that the injunction sought here would provide the plaintiffs part of the remedy they seek by way of judgment.  The effect of the preliminary relief plaintiffs seek, that is, to lift the gag provision with respect to disclosure of Doe's identity, "cannot be undone."  Id.

The standard for granting such an injunction in the Second Circuit is well-established.  "[W]hen the injunction sought will alter, rather than maintain the status quo, or will provide the movant with relief that cannot be undone even if the defendant prevails at a trial on the merits, the moving party must show a clear or substantial likelihood of success."  Beal v. Stern, 184 F.3d 117, 122-23 (2d Cir. 1999) (internal quotation marks, alteration and citation omitted).  The parties agree that this heightened

---

[3]  Typically, the standard requires " first, irreparable injury, and, second, either (a) likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships decidedly tipped in the movant's favor."  Green Party of N.Y. State v. N.Y. State Bd. of Elections, 389 F.3d 411, 418 (2d Cir. 2004)(internal quotation marks and citation omitted).

standard applies.  In addition to showing a substantial likelihood of success, the
plaintiffs must also show, as with every motion for preliminary relief, irreparable harm.

     A.    <u>Irreparable Injury</u>

     Plaintiffs have established that they are suffering irreparable injury as a result of
enforcement of § 2709(c) with regard to Doe's identity.  Section 2709(c) uncategorically
bars speech.  "The loss of First Amendment freedoms, for even minimal periods of
time, unquestionably constitutes irreparable injury."  <u>Elrod v. Burns</u>, 427 U.S. 347, 373
(1976)(plurality opinion).  The subject matter of the speech at issue in the pending
motion places it at the center of First Amendment protection.  "[P]olitical belief and
association constitute the core of those activities protected by the First Amendment."
<u>Id</u>.at 356; <u>see</u> <u>also</u> <u>Landmark Communications, Inc. v. Virginia</u>, 435 U.S. 829, 838-39
(1978).  ("Whatever differences may exist about interpretations of the First Amendment,
there is practically universal agreement that a major purpose of the Amendment was to
protect the free discussion of governmental affairs.") (internal quotation marks and
citation omitted).  Furthermore, in the specific instance at issue in the pending motion,
there is a current and lively debate in this country over renewal of the PATRIOT Act.
<u>See</u>, <u>e.g.</u>, Shannon McCaffrey, "Librarians Angered Anew by Patriot Act," <u>Philadelphia
Inquirer</u>, Aug. 8, 2005, at A02.  In connection with that renewal, legislation has been
proposed that relates to NSLs and § 2709.[4]  Despite the publication of a redacted

---

    [4] A number of bills are currently pending before the Senate and House of
Representatives, which bills propose various amendments and revisions to § 2709, including
the institution of judicial review with respect to NSL's investigative and gag powers and criminal
sanctions for violation of the gag provision.  <u>See</u> H.R. 3199, 109th Cong. (2005); H.R. 2715,
109th Cong. (2005); H.R. 1526, 109th Cong. (2005); S. 1389, 109th Cong. (2005); S. 737,
109th Cong. (2005); S. 693, 109th Cong. (2005); S. 317, 109th Cong. (2005); S. 3, 109th Cong.

complaint in this case – which reveals that a NSL was issued to an entity in Connecticut with library records – Doe cannot speak out as the recipient.  While, as the government argues, Doe can speak about NSLs in a general manner, it is clear that § 2709(c) prevents Doe from identifying itself as a recipient of a NSL.

Considering the current national interest in and the important issues surrounding the debate on renewal of the PATRIOT Act provisions, it is apparent to this court that the loss of Doe's ability to speak out now on the subject as a NSL recipient is a real and present loss of its First Amendment right to free speech that cannot be remedied. Doe's speech would be made more powerful by its ability to put a "face" on the service of the NSL, and Doe's political expression is restricted without that ability.  Doe's right to identify itself is a First Amendment freedom independent from Doe's right to speak generally about its views on NSLs.  Doe's statements as a known recipient of a NSL would have a different impact on the public debate than the same statements by a speaker who is not identified as a recipient.

Defendants argue that the question of irreparable injury is intertwined with that of the plaintiff's likelihood of success on the merits, relying on several Second Circuit cases for this proposition.  See Time Warner Cable v. Bloomberg L.P., 118 F.3d 917, 924 (2d Cir. 1997) ("Though impairment of First Amendment rights can undoubtedly constitute irreparable injury, we think it often will be more appropriate to determine irreparable injury by considering what adverse factual consequences the plaintiff apprehends if an injunction is not issued, and then considering whether the infliction of

_____

(2005).

9

those consequences is likely to violate any of the plaintiff's rights."); Charette v. Town of Oyster Bay, 159 F.3d 749, 755 (2d Cir. 1998) (quoting Time Warner Cable for the first part of this proposition).  However, the Second Circuit has distinguished these cases from those like the instant one, where the challenged statute or regulation imposes a direct infringement on speech.  "Where a plaintiff alleges injury from a rule or regulation that directly limits speech, the irreparable nature of the harm may be presumed." Bronx Household of Faith v. Bd. of Educ. of New York, 331 F.3d 342, 349 (2d Cir. 2003). Therefore, in this case, where the statute directly prohibits speech, the presumption of irreparable harm arises.

The defendants nevertheless argue that this presumption can be overcome because the plaintiffs' First Amendment right to speech is qualified by the governmental interests at stake.  The defendants contend that no irreparable harm will occur because the plaintiffs have only a limited interest in the speech in which they wish to engage, in light of the government's interests at stake.  For the reasons discussed, supra, at 9, the court rejects the defendants' contention that the plaintiffs' First Amendment rights here are limited.  The court finds that the plaintiffs have established that they are suffering, and will continue to suffer, irreparable harm as a result of the challenged non-disclosure provision of § 2709(c).

　　B.　　Substantial Likelihood of Success On The Merits

　　　　1.　　Appropriate Level of Scrutiny.  In addressing the question of substantial likelihood, the parties dispute the measure of scrutiny the court ought to apply to the statutory provision at issue.  The plaintiffs argue that, because the statute constitutes both a prior restraint and a content-based ban on speech, it must meet strict

10

scrutiny in order to pass constitutional muster.  Plfs.' Mem. Supp. at 11.  The

defendants contend that the speech restricted here is not a prior restraint and,

therefore, the statute need only meet intermediate scrutiny.  Defs.' Mem. Opp'n. at 16-

20, 29-31.  The defendants alternatively contend that the court need not determine

which level of scrutiny is appropriate here because, in their view, § 2709(c) is tailored to

accomplish a compelling state interest and meets both the intermediate and strict

scrutiny tests.  Id. at 23-29.  The court holds that § 2709(c) is subject to strict scrutiny

because it is both a prior restraint and a content-based restriction.

The court addresses first the question of whether § 2709(c) constitutes a prior

restraint.  "[A] clear definition of 'prior restraint' is elusive."  Erwin Chemerinsky,

Constitutional Law:  Principles and Policies (2nd ed. 2002) at 918.  "The essence of

prior restraints are that 'they g[i]ve public officials the power to deny use of a forum in

advance of actual expression.'"  Beal v. Stern, 184 F.3d 117, 124 (2d Cir. 1999)

(quoting Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 553 (1975)).  Section

2709(c) unquestionably  prohibits speech in advance of it having occurred.  See Ward

v. Rock Against Racism, 491 U.S. 781, 795 n.5 (1989) ("The relevant question is

whether the challenged regulation authorizes suppression of speech in advance of its

suppression.").

Defendants correctly point out that a prior restraint typically involves either a

court order or a licensing scheme which vests discretion in an agency.  See, e.g., Beal,

184 F.3d at 124-25 (quoting Forsyth County v. Nationalist Movement, 505 U.S. 123,

130-31 (1992)) (licensing scheme).  The statute at issue here may not look like a typical

prior restraint:  it is not a court order, nor does it not authorize a licensing scheme

11

subject to arbitrary application.  Contrary to defendants' assertion, however, prior restraints are not limited to these two categories of governmental restrictions.[5]  For example, the Supreme Court found a prior restraint when a state commission encouraged booksellers not to sell certain books that the commission deemed objectionable.  Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70 (1963).  There was no court or administrative order preventing such sales, but the court found sufficient "coercion, persuasion and intimidation," id. at 67, to create a prior restraint, id. at 70.

The suppression of speech here is broader than any licensing scheme.  It constitutes a categorical prohibition on the use of any fora for speech, on all topics covered by § 2709(c), as contrasted with a licensing scheme, which limits only a particular forum.  The statutory language in the NSL, signed by the FBI, would appear sufficient to "persuade" or "intimidate" most recipients into compliance.[6]  Thus, under Bantam Books, the Doe NSL qualifies as a prior restraint.

Further, the court does not agree with defendants that Seattle Times Co. v. Rhinehart, 467 U.S. 20 (1984) requires use of the intermediate scrutiny test here.  In Seattle Times, the Court wrote that, "[a]n order prohibiting dissemination of discovered information before trial is not the kind of classic prior restraint that requires exacting First Amendment scrutiny."  Id. at 33.  The Court noted that the accused court order did

---

[5]  Defendants argue that § 2709(c) is not a prior restraint because it is a gag order, "enforceable only by a penalty action after the fact."  Defs.' Mem. Opp. at 30.  As defendants conceded at oral argument, § 2709(c) does not provide for a penalty.

[6]  Based on responses to the court's questions, it appears that the FBI has issued many NSLs under § 2709 in the past, but they have not been challenged by the recipients with the exception of the one here, the one involved in the appeal in the Second Circuit, and one in Detroit.

not constitute a prior restraint because "the party may disseminate the identical information covered by the protective order as long as the information is gained through means independent of the court's processes." Id. at 34.  In Seattle Times, the trial court's protective order prevented use of material a civil litigant had requested in discovery.  Id. at 27.  This differs greatly from a law barring disclosure of the use of the government's authority to compel disclosure of information.  See id. at 32 ("[C]ontinued court control over the discovered information does not raise the same specter of government censorship that such control might suggest in other situations.")

Section 2709(c) is subject to strict scrutiny not only because it is a prior restraint, but also because it is a content-based restriction.  See Kamasinski v. Judicial Research Council, 44 F.3d 106, 109 (2d Cir. 1994) (holding that confidentiality rules imposed on complainants and witnesses before the Connecticut Judicial Review Council were content-based restrictions and thus subject to strict scrutiny).  Section 2709(c) "has the potential for becoming a means of suppressing a particular point of view,"  that is, the view that certain federal investigative powers impose profoundly on individual civil liberties to the point that they violate our constitution.  Forsyth County, 505 U.S. 123, 130-31 (1992) (internal quotation marks and citation omitted).  The statute has the practical effect of silencing those who have the most intimate knowledge of the statute's effect and a strong interest in advocating against the federal government's broad investigative powers pursuant to § 2709:  those who are actually subjected to the governmental authority by imposition of the non-disclosure provision.  The government may intend the non-disclosure provision to serve some purpose other than the suppression of speech.  Nevertheless, it has the practical impact of silencing individuals

13

with a constitutionally protected interest in speech and whose voices are particularly important to an ongoing, national debate about the intrusion of governmental authority into individual lives.  The court, therefore, concludes that § 2709(c) is both a prior restraint and a content-based restriction on free speech.

The merits of the plaintiffs' motion thus turn on the defendants' ability to demonstrate that § 2709(c)'s restraint on speech, as applied to the plaintiffs, meets the strict scrutiny test.  See Ashcroft v. ACLU, 124 S.Ct. 2783, 2788 (2004)("[T]he Constitution demands that content-based restrictions on speech be presumed invalid, and that the Government bear the burden of showing their constitutionality.") (internal quotation marks and citation omitted); Republican Party of Minnesota v. White, 536 U.S. 765, 774-75 (2002) (holding that State government had the burden of proving constitutionality of a law restraining judicial election candidates from announcing their political views); Hobbs v. County of Westchester, 397 F.3d 133, 148-49 (2d Cir. 2005) (applying strict scrutiny to regulation that is both a prior-restraint and content-based, with burden of proving constitutionality on the government).  The inquiry under the strict scrutiny test is whether the gag order currently imposed on the plaintiffs, restricting their ability to identify Doe, is narrowly tailored to meet a compelling state interest.  The court will first consider whether the non-disclosure provision of the Doe NSL, as applied in this case, serves a compelling state interest.  If it does, the court must then consider whether the non-disclosure provision of the Doe NSL is narrowly tailored to that interest.

14

2.      Is § 2709(c) Narrowly Tailored to Serve a Compelling State Interest?

The defendants assert that "§ 2709(c)'s confidentiality provision is justified by the government's interest in national security and in particular its interest in conducting effective investigations to disrupt the activities of terrorist organizations and foreign intelligence agencies."  Defs.' Mem. Opp'n. at 20.  They also assert that "[s]ection 2709(c) is adequately tailored to the government's compelling interest in confidentiality." Id. at 23.  They contend that this court ought to defer to their findings regarding the presence of a national security interest.

a.      Compelling State Interest.  While the court recognizes the defendants' expertise in the area of counter-terrorism and is inclined to afford their judgments in that area deference, those judgments remain subject to judicial review. Writing in a different context about the judiciary's role in a time of war, the Supreme Court recently rejected the "heavily circumscribed role for the courts" the government had suggested, and instead noted that "the United States Constitution . . . most assuredly envisions a role for all three branches when individual liberties are at stake." Hamdi v. Rumsfeld, 124 S.Ct. 2633, 2650 (2004).  "[T]he notion that the judiciary should abdicate its decision-making responsibility to the executive branch whenever national security concerns are present" is extremely troubling.  In re Washington Post Co., 807 F.2d 383, 391 (4th Cir. 1986).  "History teaches us how easily the spectre of a threat to 'national security' may be used to justify a wide variety of repressive government actions.  A blind acceptance by the courts of the government's insistence on the need for secrecy, without notice to others, without argument, and without a

15

statement of reasons, would impermissibly compromise the independence of the judiciary and open the door to public abuse." Id. at 391-92.  Indeed, while this court recognizes that the executive is entitled to deference on issues of national security, "[n]o matter the level of deference, [the court's] review is not vacuous." Center for Nat'l Sec. Studies, 331 F.3d at 938 (Tatel, J. dissenting) (internal quotation marks and citation omitted).  "[W]hile the [executive's] tasks include the protection of national security and the maintenance of the secrecy of sensitive information, the judiciary's tasks include the protection of individual rights." McGehee, 718 F.2d at 1149.  This court will thus examine whether the record before it supports what the government claims: that lifting the gag provision in part to permit the recipient to identify itself will harm national security.  See generally New York Times Co. v. U.S., 403 U.S. 713, 714 (1971) ("The Government . . . carries a heavy burden of showing justification for the imposition of such a restraint.") (internal quotation marks and citation omitted).

The government claims an interest that involves national security.  In this instance, based on the court's review of the defendants' ex parte submission, the investigation clearly relates to national security.  The government has a legitimate interest and duty in undertaking an investigation that includes this NSL.  Further, it is clear to the court that the NSL was not issued solely on the basis of First Amendment activities.

The government argues that it has an interest in preventing the disclosure of Doe's identity because disclosure of the NSL recipient's identity may, inter alia, permit the subject of the NSL, or those involved in the subject matter of the NSL, to deduce that the government is aware of their/his/her identity, leading them to flee or go deeper

under cover.  Defs.' Mem. Opp'n. at 2-3; <u>see also</u> Szady Decl. ¶¶ 29-30.  Even affording the government deference in its judgment about national security concerns, the court cannot conclude on the record in this case that, <u>in these circumstances</u>, the government has a compelling interest in barring the disclosure of Doe's identity. Nothing specific about this investigation has been put before the court that supports the conclusion that revealing Does' identity will harm it.  The record supplied by the defendants suggests that the disclosure of Doe's identity "may" or "could" harm investigations related to national security generally.  <u>See</u> Szady Decl. at ¶¶ 20-29.  Just such a speculative record has been rejected in the past by the Supreme Court in the context of a claim of national security.  <u>See</u> <u>New York Times Co.</u>, 403 U.S. at 725-26 (Brennan, J. concurring) ("[T]he First Amendment tolerates absolutely no prior judicial restraints of the press premised upon surmise or conjecture that untoward consequences may result.").

Further, the information that is before the court suggests strongly that revealing Doe's identity will not harm the investigation.  **SEALED MATERIAL**[7]

**CLASSIFIED MATERIAL**[8]

---

[7] The short section of the Ruling containing Sealed Material should be read here as part of the court's Ruling on Plaintiffs' Motion for Preliminary Injunction.  It forms part of the court's analysis in reaching its opinion.  This portion is filed under seal because it contains facts that were filed under seal and the public disclosure of which would moot the defendants' appeal.

[8] This brief portion of the Ruling relies on the <u>ex parte</u> classified material the court reviewed.  These materials are a part of the court's analysis.  Therefore, the court needs to articulate its reasoning with regard to them.  The court requests the defendants to cause a proper officer with the requisite security clearance to take possession of that portion of the Ruling that contains Classified Material and transmit it to the Second Circuit in connection with any appeal.  <u>See generally</u> <u>In Re Guantanamo Detainee Cases</u>, 355 F. Supp. 2nd 443, 446 (D.D.C. 2005).

The defendants, in their appeal of <u>Doe v. Ashcroft</u>, 334 F. Supp. 2d 471 (S.D.N.Y. 2004), have argued that "the proper recourse [in evaluating § 2709(c)'s non-disclosure provision] is for district courts to entertain challenges to the non-disclosure requirement, on a case-by-case basis granting relief where, but only where, it can be shown that the compelling governmental interest underlying the non-disclosure requirement are not in jeopardy."  Defendants-Appellants' Reply Brief at 25, <u>Gonzales v. Doe</u>, No. 05-0570 (2nd Cir.)(Feb. 3, 2005), <u>quoted in</u> Plfs.' Reply Mem. at 3.  This is just such a case, and there is nothing in the record to demonstrate a compelling state interest in enforcing § 2709(c) against the plaintiffs with regard to Doe's identity.  <u>See generally</u> <u>Turner Broad. Sys., Inc. v. FCC</u>, 512 U.S. 622, 664 (1994) ("When the Government defends a regulation on speech as a means . . . to prevent anticipated harms, it must do more than simply posit the existence of the disease sought to be cured.") (internal quotation marks and citation omitted).

The defendants further argue that the government has a compelling interest in concealing Doe's identity because, while that piece of information may appear innocuous by itself, it could still be significant to a terrorist organization when combined with other information available to it.  Defendants argue that, "[t]errorist and foreign intelligence organizations can and do piece together various, seemingly innocuous items of publicly available information, along with private information already in their possession, to determine the scope, focus, and progress of ongoing counterintelligence and counter-terrorism investigations."  Defs' Mem. Opp'n at 9.

Courts have considered this "mosaic" concept when determining whether individuals ought to have access to information sought pursuant to the Freedom of

18

Information Act (FOIA),[9] 5 U.S.C. § 552 (2002), or in the course of litigation discovery.[10]

However, the plaintiffs' desire here is to exercise their First Amendment rights, which

distinguishes this case from those in which an individual seeks disclosure of information

in the course of discovery or pursuant to FOIA.  Here, plaintiffs seek to vindicate a

constitutionally guaranteed right; they do not seek to vindicate a right created, and

limited, by statute.  "Th[e] difference between seeking to obtain information and seeking

to disclose information already obtained raises [the plaintiffs'] constitutional interests in

this case above the constitutional interests held by a FOIA claimant.  As a general rule,

citizens have no first amendment right of access to traditionally nonpublic government

information."  McGehee v. Casey, 718 F.2d 1137, 1147 (D.C. Cir. 1983).

        Thus, it does not appear that this "mosaic" argument has been used in this type

of context.  However, even if it were appropriate, the defendants' conclusory statements

---

        [9]  The "mosaic" argument has been invoked in the context of requests pursuant to the
FOIA.  FOIA includes a number of statutory exemptions pursuant to which an agency may
refuse to disclose requested information.  Where law enforcement materials "could reasonably
be expected to interfere with enforcement proceedings," 5 U.S.C. § 552(b)(7)(A), an agency
may refuse to release them.  "[T]he Supreme Court . . . ha[s] expressly recognized the propriety
of deference to the executive in the context of FOIA claims which implicate national security."
Center for Nat'l Sec. Studies v. Dep't of Justice, 331 F.3d 918, 927 (D.C. Cir. 2003).  Against
this backdrop, courts have "relied on . . . mosaic arguments in the context of national security,"
id. at 928, to allow the government to refuse to release information requested pursuant to FOIA.
See also CIA v. Sims, 471 U.S. 159 (1985).

        [10]  Considering whether certain documents related to an ongoing investigation regarding
national security ought to be discoverable by plaintiffs in a civil rights action, the D.C. Circuit
Court of Appeals concluded that the state secrets privilege covered information that may
appear immaterial in and of itself.  "It requires little reflection to understand that the business of
foreign intelligence gathering in this age of computer technology is more akin to the
construction of a mosaic than it is to the management of a cloak and dagger affair . . . .
Thousands of bits and pieces of seemingly innocuous information can be analyzed and fitted
into to place to reveal with startling clarity how the unseen whole must operate."  Halkin v.
Helms, 598 F.2d 1, 8 (D.C. Cir. 1978).

that the mosaic argument is applicable here, absent supporting facts,  would not suffice

to support a judicial finding to that effect.  The court asked the defendants' counsel at

oral argument if he could confirm there was a "mosaic" in this case: were there other

bits of information which, when coupled with Doe's identity, would hinder this

investigation.  Counsel did not do so.

      This court does not question that national security can be a compelling state

interest, or that non-disclosure of a NSL recipient's identity could, in some

circumstances, serve that interest.  However, in this case, the court concludes that the

government has failed to show a compelling state interest in preventing Doe from

revealing its identity.  Based on the foregoing, including the sealed portion about Doe,

and what Doe is, the nature and extent of information about the NSL that has already

been disclosed by the defendants,[11] and the nature and extent of the information that

will not be disclosed, this court concludes that, in the face of the plaintiffs' as applied

challenge, the government has not demonstrated a compelling interest in preventing

disclosure of the recipient's identity.


      The defendants' assertion of the compelling interest served by § 2709(c) is not

as narrow as the court has just defined it.  They define their interest as keeping secret

on-going counter-terrorism investigations.  The court has concluded that, in the context

of the pending motion in an as applied challenge, the interest at issue is concealing

Doe's identity as the recipient of the NSL.  However, if the interest at issue should be

---

[11]  Defendants did not believe that disclosure of the issuance of a NSL to a Connecticut
organization with library records would compromise national security.

20

more broadly defined, as defendants do, the court would agree that the defendants have demonstrated a compelling state interest in conducting its investigation in secret so that the target(s) of the investigation are not aware of it.  However, if the government's interest here is defined that way, the court concludes that § 2709(c) is not narrowly tailored to serve that interest as it is applied in this case.

        b.    <u>Narrow Tailoring</u>.  The various cases addressing gags on parties seeking to communicate information relevant to a grand jury or other investigation provide useful precedent against which to consider the instant case.  <u>See</u> <u>e.g.</u>, <u>Butterworth v. Smith</u>, 494 U.S. 624 (1990); <u>Seattle Times Co. v. Rhinehart</u>, 467 U.S. 20 (1984); <u>Kamasinski v. Judicial Review Council</u>, 44 F.3d 106 (2d Cir. 1994).  Notably, the Supreme Court has concluded that "invocation of grand jury interests is not 'some talisman that dissolves all constitutional protections.'"  <u>Butterworth</u>, 494 U.S. at 630 (quoting <u>United States v. Dionisio</u>, 410 U.S. 1, 11 (1973)).

The court accepts for the purpose of this motion that the counter-terrorism investigation at issue here differs from a criminal investigation in that the former may continue, or be of a consequence, for a very long time, whereas the latter has a shorter, defined life.  The court recognizes that years, or even decades, could pass before disclosure of information relating to a counter-terrorism investigation would cease to threaten  national security.  However, this period is not endless.  Even if such information were to remain sensitive for, say, twenty-five or fifty years, the public

interest in knowing this information would persist beyond this period.[12]

The provision of § 2709(c) that prohibits Doe from <u>ever</u> disclosing its identity is not narrowly tailored to the government interest of preventing the subject(s) of the government's investigation from learning of the government's investigation of him/it/they because this interest cannot continue indefinitely.  At some point, even if in the distant future, the subject(s) of the investigation will cease to be of legitimate interest to government investigators.  Virtually every investigation has some end point.  Even if an investigation continues until a subject's or someone else's death (if an individual) or dissolution (if an entity), neither the subject nor the fact it/he/she was a subject, can remain of interest to the government indefinitely.

Courts have rejected government attempts to impose permanent gag orders.  In <u>Butterworth</u>, the Court held that a permanent gag order on disclosure of a witness's own grand jury testimony was unconstitutional insofar as it continued after the end of the grand jury investigation.  <u>Butterworth</u>, 494 U.S at 633.  In <u>Kamasinski v. Judicial Research Council</u>, 44 F.3d 106 (2d Cir. 1994), the Second Circuit upheld a statutory provision prohibiting disclosure of certain information during an investigation of judicial misconduct.  However, the Circuit noted that, after the close of the investigatory phase, even the state's "most compelling interests cannot justify a ban on the public disclosure of allegations of judicial misconduct."  <u>Id</u>. at 110.  Especially in a situation like the instant one, where the statute provides no judicial review of the NSL or the need for its non-disclosure provision, <u>see</u> <u>Doe v. Ashcroft</u>, 334 F.Supp. 2d 471, 501-03 (S.D.N.Y.

---

[12]  Such information would, for example, be valuable to policy-makers or historians trying to learn from the past.

2004), the  permanent gag provision compels the conclusion that § 2709(c) is not narrowly drawn to serve the government's broadly claimed compelling interest of keeping investigations secret.

Section 2709(c) is also overbroad as applied with regard to the types of information that it encompasses.  All details relating to the NSL are subject to the gag order without any showing that each piece of information, if disclosed, would adversely affect national security.  The defendants themselves did not believe that disclosure of the fact of the issuance of this NSL to an organization with library records, a fact clearly within the scope of § 2709(c), would harm national security by compromising their investigation.  Further, there is nothing before the court that would suggest that prohibiting the disclosure of Doe's identity serves the government's interest in preventing the subject of the investigation or others from learning about it.  Therefore, § 2709(c) is not narrowly tailored in its scope to serve the government's interest.

The government argues that § 2709(c) is narrowly tailored to serve its interest because the information the plaintiffs seek to disclose is of a nature that the courts have recognized can be subject to a gag order in furtherance of an investigative interest.  They base this conclusion on the fact that Doe only learned of the information by virtue of its participation in the government investigation.  Defs'. Mem. Opp'n. at 16 In the instant case, Doe seeks not to communicate the substance of the NSL or the underlying investigation, but merely the fact of service of the NSL.  Although Doe did not possess that information prior to service of the NSL, this case is factually distinguishable from the cases on which the government relies.

In Butterworth, 494 U.S. at 635, the Supreme Court did not reach the issue of

23

whether disclosure of the mere fact that a grand jury was ongoing could be subject to a gag order.  There, the Supreme Court focused on the "dramatic" impact of the statutory restriction imposed by Florida statute on grand jury witnesses: "before he is called to testify . . . respondent is possessed of information on matters of admitted public concern about which he was free to speak at will.  After giving his testimony, respondent believes he is no longer free to communicate this information."  Id. Concurring, Justice Scalia noted that the Court did not reach the question of whether the fact of the investigation was protected.  "I join the Court's opinion because I interpret that to refer to the information contained within the witness' testimony, but not necessarily to the fact that the witness conveyed that information to the grand jury."  Id. at 636 (Scalia, J. concurring).  The information gagged here is of the type identified by Justice Scalia as not addressed in the holding of the case.

The Seattle Times Court addressed this question in the context of civil litigation, which is distinguishable from the present context.  "As in all civil litigation, petitioners gained the information they wish to disseminate only by virtue of the trial court's discovery processes."  Seattle Times Co. v. Rhinehart, 467 U.S. 20, 32 (1984).  Where those discovery processes contemplate a protective order with respect to discovered information, "[a] litigant has no First Amendment right of access to information made available only for purposes of trying his suit."  Id.  Seattle Times's analysis is particular to the context of pretrial discovery.  "Although litigants do not surrender their First Amendment rights at the courthouse door, those rights may be subordinated to other interests that arise in this setting."  Id. at 32 n. 18 (internal quotation marks and citation omitted).  The Seattle Times Court considered the nature, history, and goals of the

24

discovery process in particular in holding that where "a protective order is entered on a showing of good cause . . . , it is limited to the context of pretrial civil discovery, and does not restrict the dissemination of the information if gained from other sources, it does not offend the First Amendment."[13] Id. at 37 (emphasis added).

The Second Circuit has also examined this question in the context of sealed inquiries into judicial misconduct. Kamasinski v. Judicial Research Council, 44 F.3d 106, 110 (2d Cir. 1994). The Circuit identified three categories of information: (1) the information known to a person before an investigation begins or a complaint is filed; (2) the fact there is a complaint or investigation; and (3) what occurs in connection with the investigation (e.g., testimony before a hearing panel or questions asked). Id. The Kamasinski court concluded that temporarily prohibiting communication of the fact of an inquiry (i.e., the second category) is less likely to "run afoul of the First Amendment" than is "[p]enalizing an individual for publicly disclosing complaints about the conduct of a government official" (i.e., the first category). Id. at 110-11. The information plaintiffs seek to disclose initially would appear to fall within the second category. For several reasons, however, the first and second categories of information are more difficult to distinguish in the instant case than they are in the context of an inquiry into a complaint of judicial misconduct or a grand jury investigation of governmental corruption.

First, in this case, the existence of an investigation is already public: the defendants agreed to the docketing of the Redacted Complaint, which reveals that an

---

[13] As discussed earlier, the protective order in Seattle Times was examined only under the immediate scrutiny test because the court concluded that it was neither a prior restraint nor content based. 467 U.S. at 34.

investigation (of unknown topic) exists and that a NSL was issued in Connecticut to an organization with library records.  Thus, information of the sort the defendants claim Kamasinski identified as protectable (an investigation or complaint), id. at 110-11, is already public.[14]

Second, § 2709(c) creates a unique situation in which the only people who possess non-speculative facts about the reach of broad, federal investigatory authority are barred from discussing their experience with the public.  This ban is particularly noteworthy given the fact that advocates of the legislation have consistently relied on the public's faith in the government to apply the statute narrowly in order to advocate for passage and reauthorization of various provisions of the Patriot Act.  See, e.g., "Attorney General John Ashcroft, Protecting Life and Liberty (Address in Memphis, Tennessee, Sept. 18, 2003), http://www.usdoj.gov/archive/ag/speeches/ 2003/091803memphisremarks.htm (accusing those who fear executive abuse of the increased access to library records under the PATRIOT Act of "hysteria" and stating that "the Department of Justice has neither the staffing, the time nor the inclination to monitor the reading habits of Americans.  No offense to the American Library Association, but we just don't care.")  The potential for abuse is written into the statute: the very people who might have information regarding investigative abuses and overreaching are preemptively prevented from sharing that information with the public and with the legislators who empower the executive branch with the tools used to

---

[14]  The subject of the instant investigation is not known, but plaintiffs do not seek to disclose that information.  To the extent the defendants have argued that revealing Doe's identity may reveal the subject's identity, the court has rejected that argument.  See pp. 15-21, supra.

investigate matters of national security.  Thus, while the speech at issue here appears to fall into <u>Kamasinski</u>'s second category, it is in substance more like the first: a citizen complaining about governmental action.  Therefore, while <u>Kamaninski</u> stands as support for the imposition of gag orders in certain contexts, as narrowly drawn to serve a compelling state interest in protecting an investigation from disclosure, it does not support the conclusion here that the all-encompassing non-disclosure provision in § 2709(c), which covers the identity of the NSL recipient, is narrowly tailored to serve a compelling government interest.

The court concludes that the application of § 2709(c) to the plaintiffs in this case on the topic of Doe's identity does not pass strict scrutiny.  The defendants have failed to show a compelling state interest that is served by gagging the plaintiffs with regard to Doe's identity.  If the government's interest is more broadly defined as preventing an unknown subject of the government's investigation from learning of the government's investigation, which would support a finding of a compelling interest, the gag provision as to Doe's identity is not narrowly tailored to serve that interest.  Because § 2709(c) as applied cannot survive strict scrutiny, the plaintiffs have shown a substantial likelihood of success on the merits, as well as irreparable harm.  Therefore, the court grants their motion to enjoin enforcement of § 2709(c) against them with regard to Doe's identity.

## V.  STAY

The defendants requested a stay in the event the court granted the Motion for Preliminary Injunction.  "To determine whether a stay of an order pending appeal is appropriate, a court must evaluate the following factors:  '(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the

applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" Rodriguez v. DeBuono, 175 F.3d 227, 234 (2d Cir. 1999) (quoting Hilton v. Braunskill, 481 U.S. 770, 776 (1987)).  "[W]here the order stayed involves a preliminary injunction . . . it is logically inconsistent, and in fact a fatal flaw, to subsequently find no irreparable nor even serious harm to the plaintiffs pending appeal." Id. at 234-35.  The Second Circuit has therefore concluded that, "the grant of a stay of a preliminary injunction pending appeal will almost always be logically inconsistent with a prior finding of irreparable harm that is imminent as required to sustain the same preliminary injunction." Id. at 235.  An exception to this rule is the grant of a stay pending an expedited appeal.  It is appropriate for a district court to grant "a brief stay of a preliminary injunction in an appropriate case in order to permit the Court of Appeals an opportunity to consider an application for a stay pending an expedited appeal." Id. at 235.

The instant action presents such an appropriate case.  The court has concluded that the plaintiffs have demonstrated a substantial likelihood of success on the merits and irreparable harm.  The court therefore cannot find that the defendants, the stay applicants, can demonstrate a likelihood of success on the merits for the purposes of their stay application.  However, in this case, the defendants would also be irreparably harmed should the preliminary injunction enter and the circuit court later reverse this court.  Once revealed, Doe cannot be made anonymous again.  Furthermore, colorable claims exist  that the public interest lies in favor of granting the stay (if this court is in error), as well as in denying it (if this court is correct in its judgment).

28

The court finds that it is appropriate to grant a brief stay of a preliminary injunction in order to permit the Court of Appeals an opportunity to consider an application for a stay pending an expedited appeal.  See Rodriguez, 175 F.3d at 235. The court will stay enforcement of the preliminary injunction until **September 20, 2005**. The court does so based on its expectation that the defendants will file an expedited appeal and submit an application for a stay pending appeal to the Court of Appeals.

**CONCLUSION**

For the reasons discussed above, the plaintiffs' motion for preliminary relief is GRANTED.  The defendants are hereby enjoined from enforcing 18 U.S.C. § 2709(c) against the plaintiffs with regard to Doe's identity.

This preliminary injunction is STAYED until **September 20, 2005**.

Furthermore, the court directs the government to attempt, to the extent permitted by law, to allow plaintiffs' lead counsel to seek security clearance for plaintiffs' lead counsel.  The government will proceed with that process in as expeditious a manner as possible, in good faith, and pursuant to all current policies and rules.

**SO ORDERED**

Dated at Bridgeport, Connecticut this 9th day of September, 2005.


/s/ Janet C. Hall
Janet C. Hall
United States District Judge


29